INTERSTATE SAVINGS & LOAN ASS'N OF MINNEAPOLIS
v. BADGLEY et al.

(Circuit Court, D. Oregon. April 29, 1902.)

No. 2,711.

1. SAVINGS AND LOAN ASSOCIATIONS—MORTGAGES—FORECLOSURE—COMPLAINT—
   EQUITY.

   A complaint by a savings and loan association to foreclose a mortgage
   was without equity, where it appeared that in order to procure the loan
   the mortgagor was required to subscribe for stock, and that the with-
   drawal value of the stock, plus the premiums paid by the mortgagor,
   etc., more than equaled the face of the loan, and that the interest paid
   on the average balance due on the loan amounted to about 12 per cent.

2. SAME—WHAT LAW GOVERNS IN DETERMINING WHETHER COMPLAINT HAS
   EQUITY.

   Whether the complaint was without equity was not determinable by
   the laws of the state where the association was organized, but according
   to the law of the forum.

Carey & Mays, for plaintiff.
William Reid, for defendants.

BELLINGER, District Judge. This is a suit to foreclose a mort-
gage given to secure a loan or advancement made by the plaintiff
company, a savings and loan corporation organized under the laws
of Minnesota, to the defendants. On the 27th of January, 1893, the
defendants, at Portland, Or., applied for 35 shares of plaintiff's capital
stock, of the par value of $100 per share. At the same time the de-
fendants also applied for a loan of $3,500 upon certain real property
in Portland, and offered to pledge the stock applied for as an addi-
tional security for the loan. These applications were accepted, and
the following note was given by the defendants to the plaintiff:

"No. 294.        Nonnegotiable First Mortgage Note of the        $3,500.00.
        Interstate Savings & Loan Association of Minneapolis, Minn.

                                                "Minneapolis, Minn., Feb. 4th, 1893.

"In consideration of the sum of thirty-five hundred dollars ($3,500.00) this
day loaned to me as a member of the Interstate Savings & Loan Association,
Minneapolis, Minn., upon thirty-five shares of stock now held and owned
by me in said association, as evidenced by certificate of stock No. 7,183:
Now, therefore, I, the undersigned, hereby promise and agree to repay to
said Interstate Savings & Loan Association on or before the maturity of
said stock the sum of thirty-five hundred dollars ($3,500.00), with interest
thereon at the rate of six per cent. per annum, and seven per cent. premium
per annum, both interest and premium payable monthly on or before the
twentieth day of each month, commencing January twentieth, 1893. It is
agreed that this note is made with reference to and under the laws of the
state of Minnesota, articles of incorporation, and by-laws of said association.
Principal, interest, and premium payable in current funds at the office of
the said Interstate Savings & Loan Association, Minneapolis, Minn. And I
further agree to pay all taxes or assessments which may be levied or as-
sessed to the holder of this note on account thereof. And in case suit or
action is instituted to collect this note, or any part thereof, to pay such
further sum as the court may adjudge reasonable as attorney's fees in said
suit or action.                                        Clara Badgley.
                                                    "Clara Elbertson."

A certificate for 35 shares of stock was issued to the defendants as of February 1, 1893, and was transferred by them to the company as of February 18, 1893. The mortgage in suit was executed as of the date of the note, February 4th.

Among the conditions of the stock subscription was one by which the defendants were required to pay monthly 60 cents upon each share of stock until such shares became matured or were withdrawn. These payments were required to be made monthly in advance at the same time the monthly payments of premium and interest were made. In default of this monthly payment, the shareholders were liable to a fine of 10 cents per share. It was further provided that after 84 payments had been made the certificate holders should have the option of continuing payments until the stock reached maturity, of discontinuing payments, allowing those already made to remain until the stock matured by the accumulation of earnings, or of withdrawing from the association, receiving all payments made as dues, and all earnings credited thereto, less any indebtedness on the part of the member to the association, and less 2 per cent. required to be deducted for the contingent fund. On the argument of the demurrer it was assumed by both parties that 84 payments of interest, premiums, and monthly stock installment payments had been made. The agreement of the parties, as has been seen, required these payments to be made on or before the 20th of each month, beginning January 20, 1893; and the allegation as to default is that the defendants have failed to make any of the payments provided for "after the 1st day of March, 1900." If there was no default until after March, 1900, the monthly payments for January and February of that year must have been made, making 86 payments. The complaint alleges that the amount of the loan, less the withdrawal value of the certificate of stock, is $2,129.40; the withdrawal value of the certificate being credited at $1,370.60. To this amount there is added $14 paid by plaintiff on an insurance policy upon the property covered by the mortgage in suit.

The defendants demur to the complaint for want of equity, and upon the ground that it appears from the complaint that the amount in controversy is not sufficient to give the court jurisdiction.

One of the stipulations in the certificate is as follows:

"Shares in this certificate may be withdrawn at any time on ten (10) days' notice, and the holder shall receive all amounts paid in as dues on stock, less any indebtedness on the part of such member to the association, and interest in addition at the rate of four (4) per cent. per annum, computed on the average time of the investment, if the stock is six (6) months old; five (5) per cent. if one year old; six (6) per cent. if two years old; seven (7) per cent. if three years old; eight (8) per cent. if four years old; nine (9) per cent. if five years old; ten (10) per cent. if six years old; and all the earnings if seven (7) years old. Such interest will only be allowed up to the last pay day preceding date of withdrawal notice. All shares shall be withdrawn when matured."

By this stipulation the withdrawal value of shares is definitely fixed. In no case can such value be less than the amount paid on the stock. There is no reason why the withdrawal value of shares assigned to the company, to be applied on the loan or advancement, should be

other or less than the value to which the party is entitled under this stipulation. Without the interest computed on the average time of the investment, or anything on account of earnings, the withdrawal value of these shares as fixed, upon the basis of 84 payments, is $1,764. If there have been 86 payments, as must be assumed from the allegations of the complaint, the credit must be $1,806 plus all the earnings. This leaves a balance of $1,694 due, without taking account of the monthly premium payments, which aggregate $1,755.80, or of earnings. These premium payments are not applied in reduction of the principal of the loan. They are not interest payments, nor are they installment payments on stock, both of which are otherwise provided for. According to the conditions printed in the stock certificate, these payments are profits to be apportioned to the shares in good standing. If so, then they are made to be repaid to those who make them; yet nothing is credited to the defendants on this account. What has become of this $1,755.80, or what is to become of it? Is it to be a gratuity to the company? Is there to be no credit for it on the debt, or in estimating the value of the stock to be applied on the debt? It is apparent that the stock was to provide an additional security, or a bonus, or an exceptional rate of interest for the loan. The form of the transaction does not affect its character. The applications for the loan and stock are of even date, and are manifestly parts of a single transaction. It was a loan transaction, in which a large sum of money in excess of interest and credits was exacted from the borrowers in the guise of "premiums." The stock was subscribed for merely to qualify the defendants to become borrowers. It was transferred to the company, nominally to secure the loan, but really as a means of securing installment payments on the debt in advance of its maturity. The by-laws of the company require borrowers to pay interest at 6 per cent., and a premium of 7 per cent. per annum. The application for the loan contains this agreement: "And we agree to pay interest on said loan at the rate of six per cent. per annum, and a premium of seven per cent. per annum, payable monthly in advance." According to this, the premium was to be paid on the loan. If premiums paid by borrowers are to accumulate for division among stockholders, the stockholders must all be borrowers, to prevent unjust discrimination between them, and such is undoubtedly the fact. The stockholders in this association are borrowers, and nothing more.

It is argued that the contract in this case must be enforced, if it is a lawful contract, under the laws of Minnesota, where the complainant company is organized. But it must be remembered that the company comes into court, invoking the aid of its equity jurisdiction, and in all such cases "the court of equity refuses its aid to give to the plaintiff what the law would give him, if the courts of the common law had jurisdiction, without imposing upon him conditions which the court considers he ought to comply with, although the subject of the condition should be one which the court would not otherwise enforce." This, Pomeroy says, is a universal rule governing the courts of equity in administering all kinds of equitable relief in any controversy where its application may be necessary to work out complete justice. 1 Pom. Eq. Jur. § 385. The principle of this rule is that a court of

equity should refuse its aid in the enforcement of an unconscionable demand, although the right claimed is one recognized by the law, and is one against which equity would not grant affirmative relief. The court merely refuses its aid when the relief sought is inequitable. Is the relief prayed for equitable? This question is not determined by the legislation of the state where the plaintiff company is organized. The legislation of a particular state may make that lawful which is against conscience, but it cannot make it enforceable in courts of equity without its jurisdiction. The defendants have more than paid the principal of the advancement, and they have paid interest monthly in advance at the rate of 6 per cent. per annum. If allowance is made for the advance monthly payments applicable on the principal of the debt or advancement, the average principal due during the period in question has been a fraction below $1,750, so that the interest paid on what was actually due has been at the rate of about 12 per cent. In equity, this is all the complainant is entitled to receive on the advancement made.

The demurrer is sustained, and the bill of complaint dismissed, at complainant's cost.